SHEPHERD, Circuit Judge,
dissenting.
The Secretary’s current interpretation of 29 C.F.R. § 1910.212(a)(1) does not deserve deference, and when the regulation is viewed using the traditional tools of interpretation, the regulation does not apply to the conduct for which Loren Cook was cited. In affording the Secretary maximum interpretive flexibility, the majority relies on an outdated and simplified notion of deference to accept a strained interpretation of section 1910.212(a)(1) that is contrary to decades of established practice and, in the process, marginalizes the importance of consistency and notice. Because I would deny the petition for review and affirm the order of the Commission, I respectfully dissent.
I.
Applying Seminole Rock deference, we generally give the Secretary of Labor’s interpretation of his own ambiguous regulations substantial deference. See Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); Martin v. Occupational Safety & Health Review Comm’n, 499 U.S. 144, 150-51, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991); see also Decker v. Nw. Envtl. Def. Ctr., — U.S. -, 133 S.Ct. 1326, 1339, 185 L.Ed.2d 447 (2013) (Scalia, J., concurring in part and dissenting in part) (noting that Seminole Rock deference is alternatively referred to as Auer deference). Though the Secretary’s interpretation of an ambiguous regulation embodied in a citation typically deserves deference, Martin instructs that deference is only appropriate when the interpretation and the manner in which the interpretation is announced are reasonable. Martin, 499 U.S. at 157-58, 111 S.Ct. 1171. The Martin Court explicitly noted that the Secretary’s “decision to use a citation as the initial means for announcing a particular interpretation may bear on the adequacy of notice to regulated parties, on the quality of the Secretary’s elaboration of pertinent policy considerations, and on other factors relevant to the reasonableness of the Secretary’s exercise of delegated lawmaking powers.” Id. at 158, 111 S.Ct. 1171 (emphasis added) (internal quotation marks omitted). As the majority concedes, these factors, among others, may render the *1014 Secretary’s position unreasonable and, therefore, undeserving of deference.
Over time, the Supreme Court has identified circumstances in which a court should not give deference to an agency’s interpretation of its own regulations. For instance, deference is not appropriate when the agency’s interpretation is “ ‘plainly erroneous or inconsistent with the regulation.’ ” Auer v. Robbins, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989)). Deference should also be withheld “when there is reason to suspect that the agency’s interpretation ‘does not reflect the agency’s fair and considered judgment on the matter in question,’ ” Christopher v. SmithKline Beecham Corp., — U.S. -, 132 S.Ct. 2156, 2166, 183 L.Ed.2d 153 (2012) (quoting Auer, 519 U.S. at 462, 117 S.Ct. 905), which may occur when the agency’s current position conflicts with pri- or interpretations, appears to be nothing more than a litigating position, or is a post hoc rationalization of prior action. Id. at 2166-67. Our circuit has developed similar guideposts; “ ‘[djeference is due when an agency has developed its interpretation contemporaneously with the regulation, when the agency has consistently applied the regulation over time, and when the agency’s interpretation is the result of thorough and reasoned consideration.’ ” Solis v. Summit Contractors, Inc., 558 F.3d 815, 823 (8th Cir.2009) (quoting Advanta USA Inc. v. Chao, 350 F.3d 726, 728 (8th Cir.2003)); Advanta USA Inc., 350 F.3d at 728 (“The DOL’s interpretation is not conclusive, and we are not necessarily bound by the DOL’s interpretation of the [regulation].”); Sioux Valley Hosp. v. Bowen, 792 F.2d 715, 720 (8th Cir.1986) (“The erratic history of the labor/delivery room policy is not the kind of interpretation justifying deference to the Secretary’s expertise.”).
Deference is also inappropriate when an agency’s new interpretation of a regulation results in unfair surprise. See Christopher, 132 S.Ct. at 2167-68. In Christopher, the Court refused to give deference to the Department of Labor’s interpretation of one of its ambiguous regulations because doing so would “impose [a] potentially massive liability on [the regulated entity] for conduct that occurred well before that interpretation was announced.” Id. at 2167 & n. 15.[3] The Court reasoned that deference in such circumstances would result in “unfair surprise,” because the agency failed to provide fair warning of the conduct that it prohibited. See id.; Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158, 170-71, 127 S.Ct. 2339, 168 L.Ed.2d 54 (2007). The Court cited Martin for Martin’s recognition that the “ ‘adequacy of notice to regulated parties’ ” was a relevant factor to the reasonableness of an agency’s interpretation. Christopher, 132 S.Ct. at 2167 (quoting Martin, 499 U.S. at 158, 111 S.Ct. 1171). The governing statutes and regulations at play in Christopher provided little reason for the regulated entities to suspect that their long-standing industry practice was unlawful. Id. at 2167-68. The possibility for unfair surprise was particularly acute because the “agency’s announcement of its interpretation [was] preceded by a very lengthy period of conspicuous inaction.” Id. at 2168; see also E.E.O.C. v. Abercrombie & Fitch Stores, Inc., 731 F.3d 1106, 1137-40 (10th Cir.2013). As the Court noted in closing:
It is one thing to expect regulated parties to conform their conduct to an agen *1015 cy’s interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency’s interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding and demands deference.
Christopher, 132 S.Ct. at 2168.[4]
Under Martin’s “reasonableness” framework, assessed through the lens of Seminole Rock precedent, the Secretary’s current interpretation must be assessed: (1) for its consistency with prior interpretations; (2) for the possibility that it could unfairly surprise the regulated entity; and (3) for its fidelity to the text of the regulation. The question thus becomes whether the Secretary’s interpretation of section 1910.212(a)(1), announced for the first time in a citation, was reasonable. The majority says it was. For the reasons stated below, I respectfully disagree.
II.
Section 1910.212(a)(1) provides that an employer should guard its employees “in the machine area from hazards such as those created by point of operation, ingoing nip points, rotating parts, flying chips and sparks.” The Secretary interprets workpieces being ejected from Loren Cook’s lathes as a hazard “created by ... rotating parts”; thus, within the literal scope of section 1910.212(a)(1). The majority adds a couple of additional possibilities, that the hazard was “created by ... point of operation” and, by relying on the phrase “such as,” that flying workpieces nearly three feet in diameter and weighing 12 pounds could be included in the section as an unenumerated hazard similar to those enumerated.
The Secretary’s interpretation is unreasonable for three reasons. First, the Secretary has failed to show that he has consistently interpreted section 1910.212(a)(1) to apply to large objects being ejected from a lathe. Second, the Secretary’s decision to announce his unprecedented interpretation in a citation that imposed a $490,000 fine constituted unfair surprise. Third, the Secretary’s interpretation of section 1910.212(a)(1) strains a commonsense reading of the section.
A.
The Secretary has failed to show that he has consistently interpreted section 1910.212(a)(1) in the manner now asserted. The Secretary concedes that he has never issued a citation quite like this one. See *1016 retary’s Reply Br. at 15. As the majority rightfully notes, this fact does not per se render the Secretary’s position unreasonable. The Secretary needs flexibility to adapt regulatory language to a variety of situations, and the decision to issue a citation, which is within the Secretary’s discretion, is influenced by a variety of factors. See Christopher, 132 S.Ct. at 2168; Atlas Roofing Co. v. Occupational Safety & Health Review Comm’n, 430 U.S. 442, 445-46, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977). One could conceivably see the Secretary piecing together a series of interpretations that indicate a trend toward the current interpretation. But the Secretary has failed to produce a citation, publication, or interpretation even remotely similar to the Secretary’s current position. The standard interpretation letters[5] the Secretary cites merely state that section 1910.212(a)(1) should be construed broadly to address a variety of hazards. The Secretary argues that the “natural extension” of his broad interpretation means that the section should guard “against all” hazards. These interpretation letters, as vague and unhelpful as the regulation itself, only show that the Secretary has consistently failed to take his current position. With the majority so freely willing to grant substantial deference to the Secretary’s interpretations announced for the first time in a citation, one wonders why the Secretary would ever provide interpretive guidance that could limit his future flexibility to construe his own ambiguous regulations. See Christopher, 132 S.Ct. at 2168 (“[The] practice [of deferring to an agency’s interpretation of its own ambiguous regulations] also creates a risk that agencies will promulgate vague and open-ended regulations that they can later interpret as they see fit.”).
OSHA’s own current machine guarding guidance provides the following description of the hazards created by rotating parts:
Rotating motion can be dangerous; even smooth, slowly rotating shafts can grip hair and clothing, and through minor contact force the hand and arm into a dangerous position. Injuries due to contact with rotating parts can be severe. Collars, couplings, cams, clutches, flywheels, shaft ends, spindles, meshing gears, and horizontal or vertical shafting are some examples of common rotating mechanisms which may be hazardous. The danger increases when projections such as set screws, bolts, nicks, abrasions, and projecting keys or set screws are exposed on rotating parts.
Occupational Safety and Health Administration, Machine Guarding eTools, https:// www.osha.gov/SLTC/etools/machine guarding/motions_actions.html (last visited Mar. 21, 2014); see also Loren Cook’s App. at 1333-35, 1427. This interpretation, which focuses on a machine’s rotating part’s potential to crush or pin body parts, is considerably different from the interpretation the Secretary embodied in Loren Cook’s citation, which asserts that rotating parts could cause large workpieces to eject from a lathe.
To make matters worse, the Secretary’s unarticulated intent to interpret section 1910.212(a)(1) to cover the hazard here runs counter to the prevailing opinion about the scope of the section.[6] The Sec *1017 ond Circuit in Carlyle Compressor Co. v. Occupational Safety & Health Review Commission, 683 F.2d 673 (2d Cir.1982), rejected the Secretary’s attempt to interpret section 1910.212(a)(1) to cover large objects thrown from a spinning machine. Id. at 674-75. Although the Second Circuit acknowledged its ordinary obligation to “give deference to an agency’s reasonable interpretation of its own standards,” it reasoned that section 1910.212(a)(1) could not be “stretched” to “cover[] anything flying out of machines.” Id. at 675. Even if the majority’s criticism of Carlyle were valid, see majority op. at 1011, the larger problem that the majority all but ignores is that the Secretary did nothing to react to the Second Circuit’s unequivocal rejection of the Secretary’s broad reading of section 1910.212(a)(1). Moreover, the Secretary knew how Loren Cook operated its production process. In 2004, the Secretary issued a citation to Loren Cook for violating section 1910.212 for failing to guard its semi-automatic spinning machines, which operate largely similar to the lathes at issue in this appeal. See Secretary of Labor v. Loren Cook Co., 21 O.S.H. Cas. (BNA) ¶ 1705 (O.S.H.R.C. June 19, 2006). The ALJ noted that “[t]he only hazard established by the Secretary [in the 2004 citation was] the point of operation hazard created by the spinning blank,” and continued that “[t]he Secretary failed to show any other part of the spinning machines presented a hazard requiring guarding.” Id. at *3. The focus of the Secretary’s 2004 inspection was on the point of operation — consistent with its machine guarding guidance, Carlyle, and established practice — not on ejecting workpieces.
The Secretary’s failure to produce any history of interpreting section 1910.212(a)(1) in the manner now asserted is aggravated when paired with the Secretary’s apparent acquiescence to the Second Circuit’s decision in Carlyle. The concept of acquiescence leads to the second reason why deference is inappropriate here, unfair surprise.
B.
When an agency acquiesces in an interpretation of an ambiguous regulation for an extended period of time, then changes its interpretation to sanction conduct that occurred prior to the new interpretation, “there are strong reasons” for withholding deference. See Christopher, 132 S.Ct. at 2167-69; Abercrombie & Fitch Stores, Inc., 731 F.3d at 1139-40; see also Long Island Care at Home, Ltd., 551 U.S. at 170-71, 127 S.Ct. 2339 (“[A]s long as interpretive changes create no unfair surprise ... the change in interpretation alone presents no separate ground for disregarding the Department’s present interpretation.” (emphasis added) (citation omitted)). After Carlyle, the Secretary failed to issue a single citation proclaiming his current interpretation, amend the language of the section to clarify the section’s scope, or issue interpretative guidance indicating his current position. Compare Solis, 558 F.3d at 826-27 (reasoning that the Secretary’s position was consistent because the Secretary continued to take a broad view of the applicable regulation despite contrary judicial decisions). Instead, much like the De *1018 partment of Labor in Christopher, the Secretary appeared to agree that section 1910.212(a)(1) did not require guarding for large, unexpected objects being ejected from a machine. When “an agency’s announcement of its interpretation is preceded by a very lengthy period of conspicuous inaction, the potential for unfair surprise is acute.” Christopher, 132 S.Ct. at 2168. The Secretary’s conspicuous inaction here is amplified by its history with Loren Cook, which indicates that the Secretary knew the way in which Loren Cook conducted its manufacturing operations.
The majority notes that “even assuming Loren Cook had convincingly demonstrated the Secretary’s long-term acquiescence in the Carlyle interpretation, the Secretary’s present advocacy of a different interpretation is not impermissible or per se unreasonable.” See majority op. at 1012. However, according to the Supreme Court in Christopher, if Loren Cook establishes the Secretary’s acquiescence in a contrary interpretation, then the Secretary’s current interpretive position does not deserve deference. See 132 S.Ct. at 2167-68. If the Secretary’s position is not given deference, then the Secretary’s position may only prevail if the “traditional tools of interpretation” support the Secretary’s interpretation. Id. at 2170. As the following discussion indicates, a plain reading of section 1910.212(a)(1) does not support the Secretary’s interpretation. In fact, the Secretary’s interpretation is so strained as to provide an alternative reason for denying deference.
C.
The basic operative language of section 1910.212(a)(1) provides that “machine guarding shall be provided to protect the operator and other employees in the machine area from hazards such as those created by point of operation, ingoing nip points, rotating parts, flying chips and sparks.” 29 C.F.R. § 1910.212(a)(1).
The five enumerated examples in section 1910.212(a)(1) can be roughly broken into two groups. The first group, sources or causes of hazards, covers the first three examples. The second group, by-products of machine operation, covers the final two examples. The examples in the first group, point of operation, ingoing nip points, and rotating parts, all present situations in which the movement and working of the machine creates a danger at the point of contact as the operator’s body engages with the machine. The second two examples, flying chips and sparks, are by-products of the machine’s routine operation, and correspondingly by-products of the first three examples. It is worth noting that the enumerated list is preceded by “such as,” which indicates that the list is not exhaustive but is highly relevant to the scope of section 1910.212. See Donovan v. Anheuser-Busch, Inc., 666 F.2d 315, 327 (1981).
There are two ways that section 1910.212(a)(1) could cover ejected workpieces: (1) the ejected workpieces are hazards created by one of enumerated point of operation sources on the list; or (2) the ejected workpieces are by-product hazards not enumerated in the section and included by the section’s use of “such as.”
The first option fails because a plain reading of the section 1910.212(a)(1) dictates that the hazards created by “point of operation, ingoing nip points, [and] rotating parts” all relate to the operator’s physical contact with the machine during the machine’s operating cycle. This interpretation of the section is supported by the guarding techniques cited in the section. The Secretary’s interpretation of the section takes an unduly liberal stance on what qualifies as a “hazard” “created by” the point of operation or rotating parts and stretches the section’s scope too far.
*1019 Section 1910.212(a)(3)® defines the point of operation as “the area on a machine where work is actually performed upon the material being processed.” As applied to Loren Cook’s lathes, that would mean where the operator’s shaping tool makes contact with the workpiece as it spins. The regulation continues that the anticipated guard “shall be so designed and constructed as to prevent the operator from having any part of his body in the danger zone during the operating cycle.” 29 C.F.R. § 1910.212(a)(3)(h). This portion of the regulation clarifies that hazards associated with “point of operation” are hazards that arise when the operator’s body parts come into close proximity with the machine during the machine’s operating cycle. Section 1910.212(a)(3)(iv) provides further support for this interpretation of point of operation by listing several machines, such as shears, power presses, milling machines, and forming rolls, that require the operator’s body parts to make contact with the machine’s operating cycle.
Section 1910.212(a)(l)’s reference to “rotating parts” is inapplicable to the cited conduct for the same reason; the hazards contemplated are those hazards arising from the operator’s contact with the machine’s moving parts. The phrase “rotating parts” should be assessed with the other enumerated examples around it. See United States v. Williams, 553 U.S. 285, 294, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008) (“In context, however, those meanings are narrowed by the commonsense canon of noscitur a sociis — which counsels that a word is given more precise content by the neighboring words with which it is associated.”). The hazards created by a lathe’s rotating parts, much like the hazards from point of operation and nip points, arise from contact with the lathe, for instance, the risk that the operator’s clothes, limbs, or hair could be caught in the lathe. This limited interpretation is consistent with OSHA’s machine guarding interpretative materials cited above. See Occupational Safety and Health Administration, Machine Guarding eTools, supra (“Rotating motion can be dangerous; even smooth, slowly rotating shafts can grip hair and clothing, and through minor contact force the hand and arm into a dangerous position.”). The Secretary’s hyper-literal interpretation of a hazard created by rotating parts defies logic and seems to permit section 1910.212(a)(1) to apply to virtually any situation, no matter how remote, in which a hazard can be tied to some movement on a machine. See White Indus., Inc. v. F.A.A., 692 F.2d 532, 535 (8th Cir.1982) (rejecting an the F.A.A.’s interpretation of a regulation as being “unduly technical”). The guarding methods provided in section 1910.212(a)(1), barrier guards, two-hand tripping devices, and electronic safety devices, anticipate preventing ingress into the danger zone while with lathe is running and, thus, support Loren Cook’s limited interpretation the section. These guarding devices would do little to prevent the hazard for which Loren Cook was cited in this case, the ejection of workpieces nearly three feet in diameter and weighing 12 pounds.
The second possibility fails as well, because a 12 pound ejected workpiece has a vastly different nature and quality from the two enumerated by-product hazards. The workpiece is the product itself, not an incidental by-product discharged from the lathe. Moreover, the workpiece is notably larger and more significant than the two hazards enumerated (flying chips and sparks). A 12 pound workpiece shooting off of a spinning lathe creates a catastrophic hazard significantly distinguishable from the minor hazards enumerated in section 1910.212(a)(1). Because a flying 12 pound workpiece is far from being “the same kind” of hazard as those enumerated, its inclusion through the section’s “such as” phrase is improper. See Donovan, 666 F.2d at 327.
*1020 I do not doubt the Secretary’s expertise in workplace safety matters or his need for flexibility to construe ambiguous regulations. But, these justifications for agency deference are not frustrated by requiring the Secretary to provide some indication of his evolving view of a regulation’s scope prior to issuing a citation accompanied by a substantial fine. The Supreme Court in Martin warned that the Secretary’s decision to use a citation to announce a novel interpretation may be unreasonable and therefore undeserving of deference. The decision in Christopher illustrates an instance where Martin’s warning holds true. The Secretary’s interpretation of section 1910.212(a)(1) embodied in his citation to Loren Cook presents another situation where deference is inappropriate.
III.
Finally, as the preceding discussion indicates, when section 1910.212(a)(1) is assessed without granting the Secretary’s position deference, it does not cover the conduct for which Loren Cook was cited. Accordingly, I would deny the petition for review and affirm the order of the Commission.

. In Christopher, all of the Justices agreed that deference was inappropriate. See Christopher, 132 S.Ct. at 2175 ("I also agree that we should, not give the Solicitor General’s current interpretive view any especially favorable weight.”) (Breyer, J., dissenting).

. The majority in Christopher took note of a growing dissatisfaction with Seminole Rock deference. Concerns have been raised about Seminole Rock’s consistency with separation-of-power principles, see Decker v. Nw. Envtl. Def. Ctr.,- U.S. -, 133 S.Ct. 1326, 1342, 185 L.Ed.2d 447 (2013) (Scalia, J., concurring in part and dissenting in part) ("[Hjowever great may be the efficiency gains derived from Auer deference, beneficial effect cannot justify a rule that not only has no principled basis but contravenes one of the great rules of separation of powers: He who writes a law must not adjudge its violation."); see generally Manning, Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules, 96 Colum. L.Rev. 612 (1996), and the perverse incentive it provides agencies to issue ambiguous regulations, see Christopher, 132 S.Ct. at 2168 ("[T]his practice also creates a risk that agencies will promulgate vague and open-ended regulations that they can later interpret as they see fit, thereby 'frustrating] the notice and predictability purposes of rulemaking.’ ” (second alteration in original) (quoting Talk Am., Inc. v. Mich. Bell Tele. Co., - U.S. -, 131 S.Ct. 2254, 2266, 180 L.Ed.2d 96 (2011) (Scalia, J., concurring))); see also Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 525, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (Thomas, J., dissenting). Some Justices have indicated that the Court is willing to take a serious look at the continued validity of the doctrine. Decker, 133 S.Ct. at 1338-39 (Roberts, C.J., concurring).

. OSHA Std. Interp.1910.212 (D.O.L.), 2008 WL 4455006 (May 16, 2008); OSHA Std. Interp. 1910.212 (D.O.L.), 2005 WL 3801510 (Feb. 8, 2005); OSHA Std. Interp. 1910 Sub-part O (D.O.L.), 1990 WL 10090096 (Mar. 21, 1990).

. See, e.g., Long Mfg. Co., N.C. v. Occupational Safety & Health Review Comm’n, 554 F.2d 903, 908 (8th Cir.1977) (“When the [section 1910.212] is read as a whole, it simply requires that when a machine is a source of danger to operatives at the point of operation, that point must be guarded by some appropriate means or device for the purpose of pre *1017 venting any part of the body of the operator from being in the danger zone during the machine's operating cycle____”); Secretary of Labor v. Caterpillar, Inc., 1994 CCH OSHD ¶ 42318, *1 (No. 93-373, 1994) (ALJ) (“Section 1910.212(a) ... generally protects the operator from dangers associated with the point of operation. While the type of machine covered by the standard varies widely, the basic targeted hazard does not. A machine's function and the manner in which it is operated create the hazard anticipated by the standard.”), aff'd, 17 O.S.H. Cas. (BNA) ¶ 1731 (O.S.H.R.C. Sept. 4, 1996).